UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**MEDMARK OF KENTWOOD,** a Michigan Corporation, and **JOHN DOE #1** and **JOHN DOE #2**, as individuals,

      Plaintiffs,

v

**KENT COUNTY COMMUNITY MENTAL HEALTH AUTHORITY, d/b/a NETWORK 180,** a Community Mental Health Authority under Section 330.1205 of the Michigan Mental Health Code,

      Defendant.

Case No.:

Hon.

## COMPLAINT

Plaintiffs, MedMark of Kentwood ("MedMark"), John Doe #1 and John Doe #2, bring this Complaint against Kent County Community Mental Health Authority d/b/a Network 180 ("Network 180"), for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, *et seq.*

### PRELIMINARY STATEMENT

1. Drug overdoses killed approximately 72,000 Americans in 2017 – a record number that reflects a rise of nearly 10% from 2016's numbers, according to the Centers for Disease Control.  https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

2. According to the New York Times, the death toll attributed to drug overdose is "*higher than the peak yearly death totals from H.I.V., car crashes or gun deaths*."  Margot Sanger-Katz, *Bleak New Estimates in Drug Epidemic:  A Record 72,000 Overdose Deaths in*

*2017*, The New York Times, August 15, 2018, https://www.nytimes.com/2018/08/15/upshot/opioids-overdose-deaths-rising-fentanyl.html.

3. Medication-Assisted Treatment ("MAT") utilizes medications in combination with counseling and behavioral therapies to stabilize brain chemistry, block the euphoric effects of opioids, relieve physiological cravings, and normalize body functions. Studies have shown that MAT reduces drug use among opioid addicted persons. According to Dr. Nora Volkow, Director of the National Institute on Drug Abuse: "Medications can be helpful in [the] detoxification stage, easing craving and other physical symptoms that can often trigger a relapse episode. However, this is just the first step in treatment. Medications have also become an essential component of an ongoing treatment plan, enabling opioid-addicted persons to regain control of their health and their lives." (Testimony of Nora D. Volkow, Senate Caucus on International Narcotics Control, M.D., America's Addiction to Opioids: Heroin and Prescription Drug Abuse, 14 May 2014).

4. "Access to medication-assisted treatment can mean [the] difference between life or death." Michael Botticelli, October 23, 2014, Director, White House Office of National Drug Control Policy (emphasis added). Methadone, by acting on opiate receptors in the brain that are implicated in the changes in brain chemistry and function associated with drug dependence, reduces patients' cravings for opiates and blocks its effects, thereby enabling patients to lead productive lives.

5. Plaintiffs bring this action to challenge Network 180's determination that, despite the overwhelming evidence to the contrary, there is not a need for additional MAT facilities in Kent County.

6. Plaintiffs John Doe #1 and John Doe #2 are recovering opioid addicts that receive methadone treatment on a daily basis.  They are Medicaid eligible, however, both are unable to utilize Medicaid coverage to access their methadone treatment due to Defendant's refusal to recognize MedMark as a Medicaid approved MAT provider in Kent County.

7. Plaintiffs John Doe #1 and John Doe #2 both live on a fixed income due to numerous disabilities.

8. Plaintiffs John Doe #1 and John Doe #2, as opioid-dependent individuals, are disabled for purposes of the ADA and Rehabilitation Act.

9. Plaintiffs John Doe #1 and John Doe #2 are forced to attend MedMark of Kentwood that is currently a per-day pay-clinic due to Network 180's refusal to provide access to Plaintiffs' chosen MAT provider (MedMark of Kentwood).

10. At the time of the filing of this lawsuit, Network 180 has elected to contract with only <u>two MAT providers</u> – one of whom ("Cherry Street") receives approximately 95% of all eligible Medicaid eligible patients in Kent County.

11. On information and belief, Cherry Street serves between 1300 and 1400 recovering opioid addicts per day.

12. Long lines and wait-times are commonplace at Cherry Street, often with patients waiting outside in all seasons for many hours, beginning early in the morning.

13. Patients are served at Cherry Street on a first-come-first-served basis.

14. Patients needing to see a doctor will routinely wait in excess of five hours at Cherry Street before gaining access to a physician.

15. Due to Cherry Street's extraordinary wait times, discussed below in greater detail, opportunistic drug dealers, recognizing a vulnerable group of disabled individuals, are common-place outside of the Cherry Street facility.

16. Plaintiff John Doe #1 has been propositioned while at Cherry Street to buy drugs, sell his take-home doses, or buy/sell clean urine.

17. Network 180 has publicly taken the position that there is no need for additional MAT providers in Kent County because, according to its Director of Network Services, Ross Buitendorp, if Network 180 has "too many providers, it becomes difficult to manage." https://www.wzzm13.com/article/news/local/kentwood/kentwood-clinic-sues-for-access-to-addicts-treated-with-methadone/69-3636b445-6dc6-442c-a785-80b8aafeb7cd.

18. Kent County needs additional MAT providers to serve all disabled individuals.

19. Under Network 180's oversight, Kent County saw a record number of overdose deaths in 2017 due to the opioid crisis.

20. Network 180 and Mr. Buitendorp's position that too many providers creates an undue burden on the Defendant clearly ignores its obligations under Section 504 and the ADA and further evidences the arbitrary and capricious nature of its decision to refuse to open the provider panels in order to better serve the health and welfare of the poorest and most vulnerable in Kent County.

21. "Every third day, someone is dying from opioid overdose in Kent County. That's a huge problem. It's a huge deal. It is a crisis. It's a crisis everywhere in the country." Adam London, Health Officer for the Kent County Health Department. Leon Hendrix, *Kent County sees record opioid deaths in 2017*, WoodTV, March 13, 2018, https://www.woodtv.com/news/target-8/a-killer-among-us/kent-county-sees-record-opioid deaths-in-2017/1039707633.

22. Michigan, as a participant in Medicaid, must provide medical assistance to individuals who meet the eligibility standards applicable to required coverage groups (so-called "mandatory populations"). Medicaid Act, 42 U.S.C. § 1396a(a)(10)(A)(i).

23. In order to be eligible for federal Medicaid funding, Michigan must cover, and may not exclude from Medicaid, individuals who: (1) are part of a mandatory population group; (2) meet the minimum financial eligibility criteria applicable to that population group; (3) are residents of the state in which they apply; and (4) are U.S. citizens or certain qualified immigrants. *Id.* §§ 1396a(a)(10)(A), 1396a(b)(2), (3); 8 U.S.C. §§ 1611, 1641.

24. The mandatory Medicaid population groups include children; parents and certain other relatives (who are not elderly, blind, or disabled); pregnant women; the elderly, blind, or **disabled**; and individuals under age 26 who were in foster care until age 18 ("former foster care youth"). 42 U.S.C. § 1396a(a)(10)(A)(i).

25. The Medicaid Act also requires Michigan to "provide such safeguards as may be necessary to assure that eligibility … and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." *Id.* § 1396a(a)(19).

26. Defendant's decision to refuse to provide adequate access to MAT treatment providers has effectively resulted in the individual Plaintiffs being deprived access to Medicaid covered treatment options.

27. Network 180's decision to send nearly all patients to a single provider with significant wait times requiring disabled persons to stand in line for hours on end is not in the "best interests of the recipients," contrary to the requirements of the Medicaid Act. *Id.* § 1396a(a)(19).

28. Many Medicaid eligible persons, including Plaintiffs John Doe #1 and John Doe #2, are physically unable to wait in line for hours on end such that they are unable to access MAT.

29. Federal law prohibits public entities from excluding persons with disabilities or discriminating against them in the provision of benefits, programs or activities. These protections extend to entities participating in supervised drug rehabilitation programs, such as MedMark that both Plaintiff John Doe #1 and John Doe #2 attend. This action challenges Network 180's discrimination.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over the federal claims in this action, pursuant to 28 U.S.C. § 1331 and 1343.

31. Venue is proper within this District pursuant to 28 U.S.C. § 1391.

## PARTIES

32. Plaintiff, MedMark, is a Michigan limited liability company that seeks to become a Medicaid approved provider of Network 180's for the purposes of administering MAT treatment to recovering addicts. MedMark operates a "pay-clinic" located at 5500 Division Ave S, Suite A, Kentwood, Michigan 49548. MedMark sues on its own behalf and on behalf of its other patients.

33. Plaintiff John Doe #1 is a 60-year-old man who lives in Kent County, Michigan. At all times relevant to this Complaint, John Doe #1 was disabled as recognized and defined under the Rehabilitation Act and the Americans with Disabilities Act. John Doe #1 is enrolled in the Michigan Medicaid program.

34. Plaintiff John Doe #2 is a 50-year-old man who lives in Kent County, Michigan. At all times relevant to this Complaint, John Doe #2 was disabled as recognized and defined under the Rehabilitation Act and the Americans with Disabilities Act.   John Doe #2 is enrolled in the Michigan Medicaid program.

35. Defendant Kent County Community Mental Health Authority d/b/a Network 180 is a governmental body operating in Kent County, Michigan.  Network 180 LLC is a shell company created and maintained by Kent County Community Mental Health Authority for the purpose of protecting the "Network 180" name from being intentionally adopted or used by some other public or private entity in Michigan.

36. Network 180 contracts with a designated pre-paid inpatient health plan (PIHP), the Lakeshore Regional Entity ("LRE"), through which Medicaid funding is channeled.

37. To date, Network 180 has refused to produce copies of its contracts with the LRE that are responsive to an October 8, 2018 request made under the Michigan Freedom of Information Act, Public Act 442 of 1976, MCL 15.231 *et seq*.

38. Network 180 regulates who may become a Medicaid approved MAT provider in Kent County.

39. Network 180 only opens its provider panels once every six years even though a current need exists for additional MAT providers in Kent County.

40. The determination on whether a "need" exists falls to one person within Network 180, who, in turn,  makes a recommendation to the Board of Directors of Network 180 on whether to issue a request for proposal.

7

## STATUTORY BACKGROUND

A.  **The Medicaid Program / Eligibility and Coverage**

41. Title XIX of the Social Security Act establishes the cooperative federal-state medical assistance program known as Medicaid.  *See* 42 U.S.C. §§ 1396 to 1396w-5.

42. Medicaid's stated purpose is to enable each state, as far as practicable, "to furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id.* § 1396 1.

43. Using household income and other specific criteria, the Medicaid Act delineates who is eligible to receive Medicaid coverage. *Id.* § 1396a(a)(10)(A), (C).

44. The Act contains required coverage groups as well as options for states to extend Medicaid to additional population groups. *Id.*

45. Michigan, as a participant in Medicaid, must provide medical assistance to individuals who meet the eligibility standards applicable to required coverage groups (so-called "mandatory populations"). *Id.* § 1396a(a)(10)(A)(i).

46. To be eligible for federal Medicaid funding, Michigan must cover, and may not exclude from Medicaid, individuals who: (1) are part of a mandatory population group; (2) meet the minimum financial eligibility criteria applicable to that population group; (3) are residents of the state in which they apply; and (4) are U.S. citizens or certain qualified immigrants. *Id.* §§ 1396a(a)(10)(A), 1396a(b)(2), (3); 8 U.S.C. §§ 1611, 1641.

47. The mandatory Medicaid population groups include children; parents and certain other relatives (who are not elderly, blind, or disabled); pregnant women; the elderly,

blind, <u>or disabled</u>; and individuals under age 26 who were in foster care until age 18 ("former foster care youth"). 42 U.S.C. § 1396a(a)(10)(A)(i).

48. Michigan must maintain a comprehensive Medicaid plan for medical assistance that the Secretary has approved. *Id.* § 1396a. The statute defines "medical assistance" to include a range of health care services that participating states must cover or are permitted to cover at state option. *Id.* § 1396d(a).

49. The Medicaid Act requires Michigan to cover *all* members of a covered population group. In other words, Michigan may not cover subsets of a population group described in the Medicaid Act. *See id.* § 1396a(a)(10)(B). This requirement applies to optional and mandatory population groups: if Michigan elects to cover an optional group, it must cover all eligible individuals within that group. *Id.*

50. Michigan cannot impose additional eligibility requirements that are not explicitly permitted by the Medicaid Act. *See id.* § 1315(a)(10)(A).

51. The Medicaid Act requires Michigan to "provide such safeguards as may be necessary to assure that eligibility … and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." *Id.* § 1396a(a)(19).

52. Kent County Community Mental Health Authority, d/b/a Network 180, has imposed additional eligibility requirements to receive MAT coverage in Kent County that are not permitted by the Medicaid Act.

53. Through its decisions to deny the individual Plaintiffs access to their chosen provider, Network 180 forces MAT recipients that are Medicaid eligible to wait in line for hours to receive their daily treatment.

54. By adopting unreasonable requirements for MedMark to become a Medicaid approved MAT provider and, instead, referring 95% of all eligible Kent County MAT recipients to one provider, Network 180 has imposed upon the individual Plaintiffs requirements that prohibit them from obtaining Medicaid covered MAT.

## GENERAL ALLEGATIONS

55. Network 180 contracts with a designated pre-paid inpatient health plan (PIHP), the Lakeshore Regional Entity, through which Medicaid funding is managed. To become an approved Medicaid provider in Kent County, Network 180 must first open its provider panels to prospective applicants for proposals. Network 180 only opens its provider panels once every six years and even then, whether to accept a new provider is believed to be based upon the subjective belief of one individual within Network 180 to determine whether a need exists.

56. Approximately 95% of all Medicaid eligible methadone patients in Kent County receive treatment from one facility – Cherry Street. Cherry Street doses between 1300 and 1400 patients a day. Despite this, Network 180 takes the position that no need exists for additional Medicaid eligible MAT providers in Kent County, Michigan.

57. John Doe #1 is a former opioid addict and is currently participating in a medication assisted treatment program at MedMark of Kentwood.

58. John Doe #1 is substantially limited in his major life activity of walking or standing for extended periods of time due to chronic and debilitating back issues, for which he receives social security disability. John Doe #1 also suffers from extreme anxiety. John Doe #1 is a former patient of Cherry Street Health.

59. While a patient at Cherry Street Health, John Doe #1 was subjected to lengthy-lines and wait-times in order to receive his daily methadone treatment. This resulted in increased pain and suffering to him and substantially increased his anxiety. John Doe #1 also felt stigmatized and humiliated at Cherry Street Health. He was propositioned on a near daily basis by other patients and/or drug dealers outside of Cherry Street Health to sell him drugs, to buy his take-home doses, and/or to sell him clean urine.

60. At all relevant times, John Doe #1 felt unsafe at Cherry Street Health. He is eligible for Medicaid. John Doe #1 cannot access or utilize Medicaid, however, because Network 180 has assigned approximately 1300 recovering addicts to one facility (Cherry Street) and refused to open its provider panels to additional MAT facilities such as MedMark . His disabilities physically prevent him from going to Cherry Street Health. As a result, he is forced to pay out of pocket on a daily basis to receive his treatment.

61. John Doe #2 is a former addict and is currently participating in a medication assisted treatment program at MedMark.

62. John Doe #2 is substantially limited in his major life activity of walking or standing for any period of time due to his Crohn's Disease, for which he receives social security disability. He is in constant pain due to this disease. John Doe #2 cannot physically stand in line to wait for his daily medication. He is eligible for Medicaid. He cannot access or utilize Medicaid, however, because Network 180 has assigned approximately 1300 recovering addicts to one facility (Cherry Street) and refused to open its provider panels to additional Medicaid approved MAT facilities.

63. John Doe #2's disabilities physically prevent him from going to Cherry Street Health. As a result, he is forced to pay out of pocket on a daily basis to receive his treatment.

## COUNT I:

## CLAIMS UNDER THE REHABILITATION ACT – DEFENDANT'S ACTIONS UNDER SECTION 621

64. Plaintiffs incorporate by reference the allegations contained in paragraphs I through 68.

65. Congress intended that individuals seeking to overcome their addiction would be protected by the Rehabilitation Act when seeking access to services, benefits, and employment provided by a federally-funded program.

66. The Rehabilitation Act specifically recognizes as handicapped those individuals with drug-addiction who are "participating in a supervised rehabilitation program and [are] no longer engaging [in the illegal use of drugs]." 29 U.S.C. § 706 (8)(C)(ii)(II).

67. Section 504 of the Rehabilitation Act prohibits discrimination against persons with disabilities by any entity that receives federal financial assistance:

> no otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ....

29 U.S.C. § 794(a).

68. Because the Rehabilitation Act broadly defines "program or activity" to include "all of the operations of' a local government receiving federal financial assistance, 29 U.S.C. § 794(b)(1)(A) (1999), providing access to MAT, a normal function of a governmental entity, is a covered activity within the meaning of the Act.

69. Defendant's actions violate Section 504 and such actions harmed and continue to harm the individual Plaintiffs and other persons with disabilities.

70. As a proximate result of Defendant's discriminatory behavior, the individual Plaintiffs have been denied reasonable and appropriate access to MAT and have expended significant time and personal resources in an effort to access such treatment. Further, Plaintiff MedMark has expended time and financial resources and has lost the opportunity to conduct its business and provide a much-needed service to Kent County.

## COUNT II:

### CLAIMS UNDER TITLE II OF THE ADA-<br>DEFENDANT'S ACTIONS UNDER SECTION 621

71. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 70.

72. Plaintiffs are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12101.

73. Defendant Network 180 is a qualifying public entity within the meaning of the ADA. 42 U.S.C. § 12131(1)(A) (1999).

74. Section 12132 constitutes a general prohibition against discrimination on the basis of disability by public entities:

> subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

75. Congress' stated broad goal in enacting the ADA was to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 1210l(b)(l).

76. Providing reasonable and appropriate access is an activity covered under Title II of the ADA.

77. In the preamble to the regulations implementing 42 U.S.C. § 12132, the Department of Justice noted that "title II applies to anything a public entity does," 28 C.F.R. pt. 35, app. A at 438 (1998).

78. Defendant's actions violate Title II of the ADA and such actions harmed and continue to harm Plaintiffs and other persons with disabilities.

79. Because of Defendant's discriminatory behavior, the individual Plaintiffs have been denied reasonable and appropriate access to MAT and have expended significant time and personal resources in an effort to access such treatment.  Further, Plaintiff MedMark has expended time and financial resources and has lost the opportunity to conduct its business and provide a much-needed service.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in favor of Plaintiffs and against Defendant and award the following relief:

a. Declaratory relief, including but not limited to a declaration that Defendant Network 180's policies and practices discriminate against Medicaid eligible MAT patients in Kent County in that nearly all eligible patients are referred to a single facility without any consideration for a patient's ability to stand and/or to wait or any concern for the privacy of the patients;

b. Declaratory relief directing Defendant to open its provider panel to any eligible provider wishing to provide MAT treatment to Medicaid eligible patients in Kent County;

c. MedMark has suffered economic injury from this violation, including expenses of approximately $1,000,000 since May 2018 and estimated lost profits of at least $200,000 per year at its Kentwood location;

d. Damages in the amounts that Plaintiffs John Doe #1 and John Doe #2 have been forced to expend in out-of-pocket-costs for MAT treatment, in lieu of receiving Medicaid coverage, as a result of Defendant's discriminatory practices in assigning nearly all Medicaid eligible MAT patients to a single facility;

e. Award Plaintiffs their reasonable attorney fees and costs;

f. Any such further relief as the Court deems just and appropriate.

*Respectfully submitted,*

**FRASER TREBILCOCK**
Attorneys for Plaintiffs

Dated:  February 5, 2019       By:     /s/ Aaron L. Davis
                                       Aaron L. Davis (P77406)
                                       adavis@fraserlawfirm.com

                                       Thaddeus E. Morgan (P47394)
                                       tmorgan@fraserlawfirm.com

                                       124 West Allegan Street, Suite 1000
                                       Lansing, Michigan 48933
                                       Telephone:    (517) 482-5800

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of February, 2019, I electronically filed the foregoing paper with the clerk of the court using the ECF system which will send notification of such filing to counsel of record.

  /s/ Aaron L. Davis
Aaron L. Davis (P77406)